No. 27,711.

P. N. SALISBURY, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, *Appellant*.

(263 Pac. 791.)

SYLLABUS BY THE COURT.

MASTER AND SERVANT—*Federal Employers' Liability Act—Evidence.* The evidence considered in an action for damages for personal injury prosecuted under the federal employers' liability act, and held that, under federal law, a demurrer to plaintiff's evidence should have been sustained.

Appeal from Wyandotte district court, division No. 1; EDWARD L. FISCHER, judge. Opinion filed February 11, 1928. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott* and *Alfred G. Armstrong,* all of Topeka, for the appellant.

*J. H. Brady* and *T. F. Railsback,* both of Kansas City, and *J. Francis O'Sullivan,* of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages for personal injury. Plaintiff recovered, and defendant appeals.

Plaintiff was employed as a light repair man in defendant's terminal yards in Kansas City, and worked from midnight until 8 o'clock in the morning. While at work on the morning of September 11, 1925, plaintiff was directed by his foreman to procure a simplex knuckle to replace a broken knuckle on a car. Plaintiff started for a tool rack in which repair supplies were kept. To reach the tool rack it was necessary for him to cross track 86, running east and west, and the northernmost track in that vicinity. Track 86 was occupied at the time by an interstate green-fruit extra train consisting of ninety-three refrigerator cars and a caboose. Plaintiff was obliged to go through that train to get to the tool rack. The petition alleged, and plaintiff testified, that when he arrived at the tool rack he found no simplex knuckle, and it was necessary for him to look further. The petition alleged, and plaintiff testified, that he left the tool rack, started eastward, and walked on a cinder path on the north side of track 86, toward another depository of repair supplies. The cinder path was about eighteen or twenty inches from the track. He testified that while he was at the tool

Master and Servant, 39 C. J. p. 1124 n. 95.

rack the green-fruit extra commenced to move eastward. As he walked beside it it increased its speed, and he was about ten or twelve or eighteen inches from the train. The petition gave the following account of the accident:

"While he was walking along beside said train some object protruding from one of the cars of said train, a better description of which the plaintiff cannot give, struck the plaintiff in the back between the shoulders and the waist, and knocked him down and felled him to the ground, and in falling he was thrown under the wheels of said train of cars and his right leg was thrown across the rails of the track, and said train ran over the plaintiff's right leg. . . . "

The petition also contained the following paragraph:

"The defendant and the defendant's agents, servants and employees were negligent in the matters and things set out herein, in failing to give the plaintiff a reasonably safe place in which to do his work; in starting said train out with a car or cars therein with protruding pieces extending outward therefrom; in operating said train through said yards with protruding pieces extending out from a car thereof; in operating said train through said yards with a car which was wider or which occupied a greater width of track than the ordinary car; in operating said train through said yards with a car which required more than the ordinary space in which to be moved; in operating said train through said yards without warning the plaintiff, who was lawfully walking through the yards, of any unusual or extraordinary conditions attending the movement of said train; and in moving said train through said yards over said track with a car which either was equipped with defective, loose or projecting doors, or loaded with merchandise which protruded beyond the sides thereof, or which contained either projecting members or projecting objects; in operating said freight train through said yards at said time in the dark with a projection of any kind protruding out from the side thereof in such a way that it would strike the plaintiff, who was walking through said yards, and knock him down and cast him under the wheels. The plaintiff had no knowledge of the makeup of said train or of the fact that there was any projection of any kind extending outward therefrom, but the defendant and its agents, servants and other employees in charge of said train and of its inspection knew, or by the exercise of ordinary care and prudence could and should have known thereof."

Plaintiff testified that when he came to the train on his way to the tool rack the train was standing still, there were blue lights on the engine indicating the train would not be moved, and he climbed over the coupling between two cars. When he left the tool rack, the train had been in motion several minutes, and as he walked along something happened:

"Something from the train struck me in the back and caused me to fall forward towards the east. This thing struck me between the waistline and my shoulders on the right side, the side nearest to the train. It hurt my back. I fell face forward. A car wheel ran over my right foot. . . . I should judge I had walked about 35 or 40 feet east of the tool rack when I got struck and knocked down and knocked under the train. . . . This was some time after five o'clock. . . . I was struck in the back by the train. I don't know what part of the train struck me. . . . Something that stood out past the cars hit me. I do not know what it was. The train kept going on after it hit me. . . . I don't know what it was that hit me. . . . I did not see the thing that struck me. If I had I would have got out of the way. I did not see it after it struck me. . . . The train was the only thing around that I saw that was in motion."

. In giving reasons for believing something on the train or the heavy train struck him, plaintiff said it was because of the sudden jar. The foregoing is all the evidence of facts relating to cause of injury which was introduced. Defendant demurred to plaintiff's evidence, and the demurrer was overruled.

When plaintiff testified something from the train struck him, he was struck by the train, and something that stood out past the cars hit him, he was not testifying to facts. He was stating the result of his own mental processes, and what he thought, when it was stated, conveyed no information whatever relating to the cause of his injury. The only facts relating to cause of injury testified to by plaintiff were that he was struck in the back while he was walking beside the moving train, which was the only thing he saw, felt a sudden jar, was knocked down, and a car wheel ran over his foot.

The action was prosecuted under the federal employers' liability act. The question of liability of the defendant must be determined by federal law, and this is true to the extent that, on review of a judgment of a state court, the federal supreme court will examine the record for itself to ascertain the sufficiency of the evidence to support a finding of actionable negligence. (*C. M. & St. P. Ry. v. Coogan,* 271 U. S. 472.)

The following principles applicable to cases arising under the federal employers' liability act have been enunciated by the supreme court of the United States: In case of accident to an employee, he must prove not only the cause which operated to produce the injury, but also some negligent act or omission of the employer in which the cause of injury originated. The fact of accident does not warrant

an inference of negligence. Negligence is an affirmative fact which must be established by evidence. When the evidence leaves cause of injury in doubt, and any one of several things may have been the cause, the jury may not choose one of them by guess, and find negligence without a satisfactory basis for the conclusion. With the presumption that the injured employee used due care goes the correlative presumption that the employer used due care. This presumption must be overcome by evidence. When circumstantial evidence is relied on to prove a fact, the circumstances must be proved. The circumstances must not themselves be presumed, and one presumption cannot be built upon another. (*Patton v. Texas and Pacific Railway Co.*, 179 U. S. 658; *Looney v. Metropolitan Railroad Co.*, 200 U. S. 480; *Chi., Rock Isld. & Pac. Ry. v. Bond*, 240 U. S. 449; *New Orleans & N. E. R. R. Co. v. Harris*, 247 U. S. 367, 371; *C. M. & St. P. Ry. v. Coogan*, 271 U. S. 472.)

The principles enunciated in the cited cases have been applied in numerous decisions by United States circuit courts of appeal and United States district courts. The case of *Missouri, K. & T. Ry. Co. v. Foreman*, 174 Fed. 377, decided by the circuit court of appeals, eighth circuit, is instructive. One of the headnotes states the facts:

"A freight train on defendant's railroad broke in two by the pulling out of a drawhead of the car next the engine, which was stopped about ten feet from the car while the engineer, plaintiff's intestate, who was conductor, and a brakeman, were making a temporary attachment. While so at work, the engine moved back, and deceased was caught between it and the car and killed. Plaintiffs alleged two acts of negligence on the part of defendant: A defective air brake, which permitted the engine to move; and a leaky throttle. But it appeared that the engine moved upgrade, and it was not shown that the lever was so set that it would move backward if started by the steam. The fireman was on the engine. *Held*, that in the absence of some evidence to show what in fact caused the engine to move, and that it was due to some act of negligence on the part of defendant, it could not be held liable." (p. 378.)

In respect to the subject of leaky throttle, the opinion by Pollock, district judge, reads:

"Again, it is true, there is evidence in the record that the engine in question on the day of the accident leaked steam at the throttle; but the extent of such leakage is not shown, more than that the engine moved. It is argued, however, from these premises, as the engine did leak steam at the throttle, and as it did move backward, it will be presumed the engine must have leaked steam to such an extent as to show the railway company negligent or it would not have moved backward. This, however, is simply reasoning in a circle

without established premises or necessarily correct conclusion, and for this reason: The presumption is that defendant furnished an engine reasonably suitable for the work to be performed by it, with appliances in a reasonably safe condition for use; that is to say, it was not negligent in this regard. This presumption must be overcome by evidence before a recovery can be had on this ground.

"Again, the process of reasoning here employed is faulty and illogical, in that it bases the presumption of negligence on a presumption and not on an admitted or established fact; whereas, a presumption of fact must be based on a known or established fact, and can never be founded on another presumption. [Citations.] In *Douglas v. Mitchell's Ex'rs*, 35 Pa. 443, Mr. Justice Thompson stated the rule as follows:

"'As proof of a fact the law permits inferences from other facts, but does not allow presumptions of fact from presumptions. A fact being established, other facts may be, and often are, ascertained by just inferences. Not so with a mere presumption of fact. No presumption can with safety be drawn from a presumption; there being no fixed or ascertained fact from which an inference of fact might be drawn, none is drawn.'" (p. 383.)

The term "presumption" is here used, as in other federal court opinions, in the sense of "inference." The case differs from this case in this particular: In the Foreman case there was direct evidence of a somewhat faulty condition of the engine which was proposed as a basis for inference, in addition to the facts that the engine moved and the conductor was killed. The engine leaked steam at the throttle. In this case, there is no evidence that anything was wrong with the green-fruit extra.

The case of *Smith v. Pennsylvania R. Co.*, 239 Fed. 103, decided by the circuit court of appeals, second circuit, is as nearly identical in essential facts with the case under decision as two cases could well be. One of the headnotes states the facts:

"Plaintiff, a brakeman in defendant's employ, while walking between two tracks to reach the cars on which he was working, was passed by another train and struck and injured by some object which he thought felt like iron. There was no showing that anything projected from the passing train, although it was contended that firemen frequently allowed hooks used in raking the fire to extend over the side, and that under the doctrine of *res ipsa loquitur* the burden of explaining the injury was upon defendant. *Held*, that, as the presumption which the jury may make cannot serve as the foundation for another presumption, and as trains frequently catch and throw heavy objects which may injure those in proximity, plaintiff's showing was not enough to take the case to the jury." (p. 103.)

In the opinion the court dealt with the doctrine of *res ipsa loquitur* as if it were necessary to do so, citing the case of *San Juan Light*

*Co. v. Requena,* 224 U. S. 89, and *Sweeney v. Erving,* 228 U. S. 233. Neither of those cases was one between employer and employee, and the decisions in the cases of *Patton v. Texas and Pacific Railway Co.,* 179 U. S. 658, and *Looney v. Metropolitan Railroad Co.,* 200 U. S. 480, and numerous federal cases applying those decisions, were overlooked. Erroneously assuming that the doctrine of *res ipsa loquitur* was pertinent, the court nevertheless disposed of the case as follows:

"Before, however, any defendant is called upon to explain how (*e. g.*) an injury was received, there must be facts proved affirmatively showing a surrounding situation which in ordinary course would not permit or produce injury, and also that something under defendant's control did notwithstanding inflict the injury complained of. With proof in this shape, the jury may infer negligence from the occurrence of injury.

"The plaintiff's difficulty in this case is that there is no proof that any definitely indicated thing wrought the injury, nor that the circumstances rendering it possible for the injuring thing suggested (*i. e.,* the rake hook) to reach or touch him existed at the time and place of damage." (*Smith v. Pennsylvania R. Co.,* 239 Fed. 103, 104.)

In the Smith case a specific thing which did sometimes stand out from a passing train was proposed as a basis for inference. In this case there was no evidence that anything stood out from the train, and plaintiff could not make out a case without building inference upon inference.

In this instance cause of injury was placed in the realm of speculation and conjecture by the petition. The petition alleged defendant was negligent in that the train contained a wide car, and defendant failed to warn plaintiff of any unusual or extraordinary condition attending movement of the train. Plaintiff testified the train struck him. It is not likely plaintiff meant the train jumped sidewise across ten or twelve or eighteen inches of space, struck him in the back, and then moved on. If he meant a wide car struck him, the guess at cause of injury was as good as any other proposed; but it could not take the case to the jury. There was no testimony that some refrigerator cars are not of standard width. If there are refrigerator cars of extra width, there was no evidence that the train did contain one. If the train did contain one, there was no testimony that presence of such a car in a train is unusual, or creates such extraordinary danger that it becomes necessary for the Santa Fe, when transporting such a car, to warn all yardmen between California and Chicago that the car is coming, so they will not walk too close to

the track.  Perhaps considerations such as these led the court to take from the jury the wide-car theory of the petition and the evidence, and limit the field of speculation concerning cause of injury to an object protruding from one of the cars.  The jury's conjectures upon that subject are shown by special findings of facts, which read as follows:

"Q. 3.  If you answer question No. 1 [relating to inspection] 'Yes,' was any object protruding from the north side of the train when the inspection was made?  A.  The time it took to inspect the train a projection could have been overlooked.

"Q. 4.  Was plaintiff's injury caused by some object which protruded from the side of the train?  A.  There must have been."

In cases of this character, the authority of the federal courts extends not merely to interpretation of the federal employers' liability act, but to application of the common law as interpreted by the federal courts.  (*C. M. & St. P. Ry. Co. v. Coogan*, 271 U. S. 472, 474.)  Under the law as interpreted by the federal courts, the demurrer to the evidence should have been sustained, and it remains to inquire whether the defect in the evidence was supplied by testimony introduced after the ruling on the demurrer.

Defendant's testimony was that Hayes, a switchman, riding on the footboard of a switch engine operating on a track south of track 86, heard plaintiff's groans, and gave the engineer a violent stop signal.  The switch engine stopped.  Hays, and Beil, another switchman who was on the footboard of the switch engine, went over the top of the moving green-fruit extra, and went to the place where plaintiff was lying.  Beil took measures to stop the flow of blood.  L. N. Thomas, the night yard foreman, came up, and others came up.  Plaintiff was placed on a stretcher, and was carried a short distance to the space between the yard office building and the foreman's office.  Plaintiff remained there until a way car could be brought up, in which he was removed to a hospital.  While plaintiff was lying on the stretcher waiting for the way car to come, a number of persons gathered about him.  Mr. Thomas, the responsible agent of the company having charge of the men in the yards, of inspection, and of getting trains in and out of the yards, asked plaintiff how the accident happened—was he crawling under or crawling through?  Plaintiff said no, he had already got through, and he slipped and fell.  A. A. Teegarden, the day foreman, who began work at six in the morning, arrived, and went to the stretcher.  He testified he heard

Mr. Thomas ask plaintiff what he was doing, and plaintiff answered that he was going through between after a knuckle, and slipped. Fred Fowler, a car inspector, was present at the time, and testified as follows:

"After I and the other man carried Mr. Salisbury east to where the yard office was, I heard a conversation between him and Mr. Thomas as to how this accident occurred. Mr. Thomas asked him how it happened, and was he crawling through the train or crawling under, and Mr. Salisbury said he had already crawled through, and slipped and fell down, and tried to roll away from the train, and in rolling away he had got his foot under it."

Will Farris, another car inspector, testified as follows:

"There was a man, a Mr. Beil, I believe it was, had a rod, and he was twisting it around his leg to stop the blood when I got there. They lifted him on the stretcher, and I helped carry him down between the yard office and our foreman's office. I heard Mr. Thomas ask him how he got that done, and he said he slipped and went down, and when he rolled out of the way it ran over his foot."

On Monday following the accident, F. D. Sudduth, the night foreman, visited plaintiff at the hospital. Plaintiff was one of Sudduth's men, and Sudduth called at the hospital to see how he was getting along. Sudduth seemingly had the instinctive human interest which Thomas and all the men working in the midst of the hazards of the yards naturally would have, and he asked plaintiff how the accident happened. Sudduth testified as follows:

"I said, 'Salisbury, how did it happen?' I said, 'Were you crawling through—climbing through the train?' He said, 'I was already through.' He said, 'My foot slipped and I started to fall. When I started to fall I heard the train, and I tried to roll out of the way, and I rolled under the wheel.'"

One of defendant's physicians and surgeons, Dr. D. E. Clopper, was called to treat plaintiff, and amputated plaintiff's right leg about four inches above the ankle. Doctor Clopper testified plaintiff made no complaint to him of any injury to his side or back.

There is no hospital record of any injury to plaintiff's side or back, or of any treatment of such an injury. The hospital record, introduced by plaintiff in rebuttal, shows a routine alcohol rub after the morning bath, shows a second alcohol rub about 6:30 in the evening of each day, and shows an alcohol rub at midnight of the second day. Doctor Clopper testified, on cross-examination by plaintiff, as follows:

"Q. If a man had two or three alcohol rubs a day to his back, it would indicate he had some involvement somehow to the tissues of his back, wouldn't it? A. It would certainly indicate he had some trouble."

The hospital record, however, contains nothing to indicate that plaintiff's back was ever given an alcohol rub, as a distinct or specially affected portion of his body; and if at any time during the twenty-nine days plaintiff was in the hospital he complained of his side or back, or his side or back were treated locally, the fact did not get on the hospital chart which showed his condition and what was done for him, hour by hour.

The cars of the green-fruit extra were loaded with oranges and grapes. Such trains are designated "Red Ball Freight," have preference over other freight trains, and "go right on through." When the train was made up it was inspected by two inspectors, one of whom inspected the south side, and the other, Will Farris, inspected the north side. Farris commenced his inspection at the caboose at the west end of the train, and ended at the engine at the east end of the train. Doors were closed and locked, nothing was loose or hanging down, and nothing was protruding from the north side of the train. Very soon after the inspection was completed the train was put in motion and proceeded on its way to its destination.

F. J. Grandstaff was conductor of the green-fruit extra. When he came out of the yard office to take his run, he saw plaintiff, went to him, and remained until the way car came by, which he boarded. He testified the train was inspected at Henrietta, the first stop of consequence east of Kansas City. He personally inspected the north side of the train. The doors were all closed, none of the door seals was broken, and nothing was hanging out which might strike anyone. Marceline is the end of the division. When the train arrived at Marceline it was inspected. Two nuts were missing, which did not cause anything to protrude from the car. There were no loose or unfastened doors, no loose grab-holds, no loose pin-lifters, and nothing protruded from the side of any of the cars.

Defendant's evidence disclosed that the doors of refrigerator cars open by swinging outward, and in this respect differ from other cars, which have sliding doors. The probability that Farris could inspect the north side of the train without running into an open door himself, or without noticing an open door, is not a subject for this court to consider. Likewise an exercise in conjecture that perhaps a door was not locked and sealed as it should have been, or was locked and sealed as it should have been, and was thrown open by the starting of the train, is not one in which this court may indulge. The trouble with plaintiff's case was, he did not have a scintilla of

evidence that he was struck by an open door. All the evidence he had was that he was struck, and the jury cannot be left fancy free to base a finding of actionable negligence on that fact. It would be just as reasonable to infer that plaintiff was struck by a wide car, as the petition surmised, or by some appliance containing a latent defect which inspection would not disclose, and which was converted into a menace by the starting of the train, in which event defendant would not be liable.

Defendant's witnesses were cross-examined with respect to coupling-pin lifters. If their evidence were to be believed, plaintiff could not have been injured by a pin lifter. The inspectors never saw a pin lifter projecting outward from the side of a car. If the evidence of the witnesses was discarded in whole or in part, there was no evidence that any pin lifter of the green-fruit extra was defective, or could by any possibility strike plaintiff, or did strike plaintiff.

Defendant's inspectors described the manner in which the train was inspected. The jury found the inspection was not thorough, and because of that fact defendant was negligent. Whether the inspection was thorough is not now important. The purpose of inspection was stated to be to find things which ought to be fixed. Evidence of lack of thorough inspection merely suffices to charge the employer with notice of defects discoverable by proper inspection, in the thing which caused injury. What that thing was must be disclosed by proof, and so we get back to the state of ignorance from which we started. There was no evidence except fact of injury that anything was wrong with the green-fruit extra. In the case of *Stepanovich v. Pittsburgh & Baltimore Coal Co.*, 218 Fed. 604, C. C. A., Third Circuit, the syllabus reads:

"In an employee's action for injuries, claimed to have been caused by the employer's failure to provide a reasonably safe brake for use on a coal-pit car which he was required to handle, the happening of the accident was not proof of negligence on the part of the employer, and the burden was on the employee to prove that the employer's negligence caused the accident.

"In an employee's action for injuries, evidence as to the employer's failure to inspect was not sufficient proof of negligence, in the absence of any showing that there was any defect in an appliance, since the purpose of an inspection is to discover defects, and the failure to make an inspection merely charges the employer with notice and knowledge of what due inspection would have shown." (¶¶ 1, 3.)

In the opinion it was said:

Salisbury v. Atchison, T. & S. F. Rly. Co.

"The principle on which this case must be determined is laid down by the supreme court of the United States in *Looney v. Metropolitan Co.*, 200 U. S. 486, 26 Sup. Ct. 305, 50 L. Ed. 564, where that court said:

" 'To hold a master responsible, a servant must show that the appliances and instrumentalities furnished were defective. A defect cannot be inferred from the mere fact of an injury. There must be some substantive proof of the negligence. Knowledge of the defect, or some omission of duty in regard to it, must be shown.' "   (p. 605.)

After stating the evidence, the opinion proceeds:

"This comprises the entire testimony of the plaintiff as to the accident. It shows the brake handle did not catch in the notches and went to the full limit of the keeper, and that by reason thereof the boy fell under the car. As to what was wrong with the brake there was no proof. Whether a brake shoe had come off or been broken; whether a connecting rod had parted; whether the brake handle had given way; or whether whatever had happened was some patent thing which inspection would have shown, or was some latent defect which no inspection or inspections would have disclosed—all are matters left to conjecture instead of being proven by evidence. Measuring this proof by the standards the supreme court has set—and very wisely so, as reflection will show—it is clear to us that the plaintiff has not proved any negligence on the part of this coal company. . . . There being such lack of proof as to the cause of the accident, it is manifest that to say the company's negligence is established by lack of inspection is to lose sight of the purpose of inspection. The making of an inspection is to discover defects and thus avoid accidents. The failure to make inspection serves to charge defendant with notice and knowledge of what due inspection would have shown. But where the proof fails to show any defect which inspection would have disclosed, it is clear that no basis of defect is proved to have existed with which to charge the defendant with notice by reason of noninspection." (p. 606.)

From the foregoing it is manifest that if plaintiff's idea about cause of his injury was correct, and he was in fact struck by some unknown object which protruded from the side of some car, he did not extend his proof far enough to establish actionable negligence on the part of defendant.

Nothing else in the evidence introduced after the demurrer to plaintiff's evidence was interposed requires mention. It is clear that plaintiff's original case was not aided by evidence introduced subsequent to the ruling on the demurrer.

Under federal law, the judgment of the district court must be reversed and the cause must be remanded with direction to sustain the demurrer to plaintiff's evidence.

It is so ordered.