No. 28,499.

MABEL G. TOOPS, as Administratrix of the Estate of M. G. Toops, Deceased, *Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

(277 Pac. 57.)

Opinion filed May 4, 1929.

*William R. Smith, Owen J. Wood, Alfred A. Scott, Alfred G. Armstrong,* all of Topeka, *John S. Simmons,* of Hutchinson, and *William Osmond,* of Great Bend, for the appellant.

*Carr W. Taylor* and *James N. Farley,* both of Hutchinson, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was one under the federal employers' liability act by a widow, as administratrix, to recover for the death of her husband. Plaintiff prevailed, and defendant appeals.

The facts were substantially these: M. G. Toops had been in the employ of the defendant railway company since 1913. For several years prior to August 12, 1926, he had been in passenger service running out of Kansas City. The middle of August of that year he was transferred to Dodge City as freight conductor from Dodge City to Elkhart. (He had not run on this line for some thirteen years.) On August 12, 1926, with a crew consisting of himself as conductor; Nolan, head brakeman; Hemphill, rear brakeman; Hall,

engineer, and Phillips, fireman, he ran from Dodge City to Elkhart. They passed through Rolla in the afternoon, but did not stop. They started on the return trip from Elkhart about eleven o'clock the night of August 12, picked up four empty cars at Wilburton, and arrived at Rolla between 12:30 and 12:45 the morning of August 13. The train consisted of about thirty cars.

The main line of the defendant railway company through Rolla runs approximately east and west. There was a passing track north of the main-line track, 1,600 or 1,700 feet in length, and another passing track, 800 feet in length, south of the main-line track and south of the depot, which was also south of the main-line track. South of the last-mentioned passing track was a third track which ran to two elevators, which were south and west of the depot. For convenience we will denominate this the elevator track. Crossing all the tracks west of the depot and passing between the elevators was a public road.

Upon arrival at Rolla the train stopped, with the engine just west of the depot. Hemphill and Toops, who were riding in the caboose, got out and walked toward the front of the train, one on either side. They had orders to pick up five loaded grain cars which were at the elevators on the elevator track and to take fifteen empty grain cars from the north passing track and spot them at the elevators on the elevator track. Nolan, who had been riding the front of the train, took the engine with the four empty cars picked up at Wilburton, went east on the main line, backed on to the elevator track and picked up the five loaded grain cars. Hemphill went across to the elevator track and assisted Nolan in connecting up the loaded grain cars. Having done so, they went on east, got on the main-line track and then backed west to a coupling with the train, Toops making the connection with the air hose. Nolan, Hemphill and Toops met on the station platform and went over the switch list together.

The grain cars on the north passing track were in two sections, four or five of them west of the public road crossing. East of the grain cars on the passing track were twelve stock cars. There was a cross-over switch from this north passing track to the main line about 900 feet east of the depot. The stock cars were foul of the cross-over switch, and in order for the engine to get on the north passing track to connect up with the empty grain cars it was necessary for it to go to the east end of the passing track, back into the

stock cars, push them back and couple on to the grain cars. Nolan went east with the engine, backed in on the north passing track and coupled into the east end of the stock cars.

Hemphill left Toops, went from the main line north to the passing track and coupled up the stock cars with the grain cars. Toops remained on the station platform, going through his switch list. After coupling with the grain and stock cars they all (except Toops) proceeded east on the north passing track out on the main line. Nolan last saw Toops alive on the platform at the time the grain cars were pulled out on to the main line. Hemphill last saw him alive on the east end of the platform with his lantern on a truck and his train book in his hand, looking through his switch list. He was run over and killed at a derail on the elevator track about 300 feet east of the depot by the grain cars which were "kicked in" on such track by the train crew. There was a rather sharp curve in the elevator track where it left the main line. It went through a cut, the bank of which on the south side was close to the elevator track and eight or ten feet high. A person on the elevator track at the derail mentioned could not be seen by the engine or train crew at the point where the "kick in" was made.

The principal question for our consideration is whether under all the facts and circumstances there was sufficient evidence to take the case to the jury and to sustain the jury's finding that the defendant was negligent in the manner in which it "kicked in" the cars.

The jury answered special questions as follows:

"1. Was M. G. Toops, the deceased, in charge of the train and switching operations at and before the time he was killed? A. Yes.

"2a. Was M. G. Toops killed by coming into contact with the fifteen grain cars that were being placed on the elevator track?

"2b. If you answer the preceding question 'yes,' state which car, if any, struck Toops. A. The first car on west end of the fifteen grain cars.

"3. Were there any marks of blood on the rear car of the fifteen grain cars? A. There was no direct evidence to show there was or was not.

"4. Were there marks of blood on the south wheels of all the other grain cars except the rear car? A. Yes.

"5. Did Toops know of the coming on the elevator track of the fifteen grain cars? A. He knew they were to come.

"6. Was Conductor Toops supplied with a good lantern? A. He had a good lantern.

"7. If you answer Q. No. 6 in the affirmative, then state if he could have by the aid of said lantern seen the approaching cars. A. No.

"8. Had not Toops formerly worked on the Elkhart branch from Dodge City to Elkhart? A. Yes.

"9. Had the yards at Rolla, Kan., been materially changed since he worked on said line? A. We don't know.

"10. State fully in what the negligence of the defendant consisted, if any. A. First, in not protecting rear end of fifteen grain cars. Second, in engineer not sounding signal when starting to back cars around curve and through cut. Third, poor condition of the track at the derail switch."

The defendant contends that the plaintiff failed to show many essential facts necessary to entitle her to go to the jury on the issues. To determine the correctness of this contention requires a careful review of what evidence had been adduced. The facts narrated above are not in dispute and need not be repeated.

A book of rules prepared by the defendant and issued to trainmen for their government in handling of trains was introduced in evidence. Some of these rules are pertinent here. And it is perfectly clear they were not followed.

"STATION.—A place designated on the time-table by name, at which a train may stop for traffic; or to enter or leave the main track; or from which fixed signals are operated.

"YARD.—A system of tracks within defined limits provided for the making up of trains, storing of cars and other purposes, over which movements not authorized by time-table, or by train order, may be made, subject to prescribed signals and regulations."

Under the evidence Rolla is a "station."

"SEC. 102. When cars are pushed by an engine (except when shifting in making up trains in yards) a flagman must take a conspicuous position on the front of the leading car and signal the engineman in case of need.

"SEC. 320. Trainmen and yardmen, before switching or moving cars at stations, must ascertain that there are no persons or property on or about the same that might be injured or damaged by so doing.

"RULE 381. Conductors of freight trains are required to do their work thoroughly at stations, bearing in mind that trains are run to do the business of the road and not merely to make time over it. Trains, however, are expected to run with regularity and as nearly on time as the prompt performance of work and rules will permit.

"RULE 396. They must do such switching as shall be necessary in taking cars for their own trains or in leaving cars from the same. Local freight trains are generally to do necessary switching at stations, but any freight train may, in case of necessity, be called upon by station agents to do such work, and the same will be performed. Conductors when at stations doing work will attend personally to the switching unless engaged in checking the unloading way freight as provided in rule 389, when they may allow brakeman, if competent, to do the switching.

"RULE 483. They will take into consideration that the lives of passengers and trainmen, as well as the property of the company, are intrusted to their

care, and it is fully expected and required that they will not only attend to all signals and instructions, but also that they will, on all occasions, be vigilant and cautious themselves, not trusting alone to signals or rules for safety. Whenever it becomes necessary to protect rear of train, enginemen will promptly signal flagman as per rule 14 (c).

"SEC. 473. They will, in rounding all curves where the view is obscured, sound the whistle, using the signal prescribed in rule 14. (Rule 14 provides for two distinct whistles.)

"SEC. 478. They will use great care in backing up to take a train or backing into a siding to take or leave cars, and will approach so slowly that couplings can be made without injury to persons or property.

"SEC. 24. When cars are pushed by an engine (except when shifting or making up trains in yards) a white light must be displayed on the front of the leading car by night."

Under the rules it was the duty of Conductor Toops to assist in the switching operations; it was his duty personally to see that the cars were spotted at the respective elevators as called for by the switch list which he was examining when last seen by Nolan and Hemphill; to see that there were no obstructions on the track; that the road crossing west of the depot was left open; that the brakes were properly set to hold the cars at each one of the elevators. The performance of these duties required him to be on the south side of the elevator track, the elevators being on that side, and also the engineer's side of the train. There was a path on the south side of the main line eastward from the depot. It is the theory of the plaintiff that Conductor Toops followed that path to a point north of the derail and then started south to cross over the elevator track.

The elevator track at the derail was skeletonized. A witness stated there was possibly a "gallon" of dirt between the ties. Thistles and weeds had grown up between the ties and obscured the actual condition of the track. The route suggested by the plaintiff is the nearest and most practical one from the depot platform where Toops was last seen to where his body was found. No eyewitness saw him meet his death. His body was found between the rails of the elevator track at the derail. His shoulders were upon, and jammed against, the derail, his body lying diagonally across the track between the rails, with his feet to the north and east toward the north rail. His head and right arm were mashed off, and with his hat were lying south of the south rail of the elevator track near the derail. His lantern and lead pencil were lying near together, south of the elevator track about two or three feet away from the

south rail of the track, his lead pencil lying between his lantern and the south rail. His train book was found lying in the center of the track between the rails. The surface of the track between the rails showed clearly that the body was dragged westward two or three feet until his shoulders were jammed against the derail. Three or four cars passed over his body and were standing west of the derail where they stopped from lack of momentum.

As before noted, the train crew, except Toops, had gone east on the main line with the train. The night was so dark that during the switching operations the men could not be seen any considerable distance. Their respective positions were discernible only by the light from their lanterns. Neither the enginemen nor brakemen, from their positions, could be seen around the curve on the elevator track on account of the cut and the bank above mentioned. Hemphill gave the kick-in signal to Nolan and the enginemen. An attempt at a kick-in was made but was not successful because the condition of the road was such that Nolan was unable to get on the train and cut the grain cars from the stock cars. Nolan testified:

"I was slow about getting on and I missed the pin. I was slow on account of the condition of the track. There were weeds there and the tracks were skeletonized and bad footing along there."

Here it is contended that the crew was derelict in its duty. Nolan gave a second kick-in signal. The cut was successfully made. Instead of one of the brakemen riding the kicked-in grain cars, according to the rules, both remained with the engine and the stock cars. The kick-in sent the fifteen grain cars west down the main-line track and on to the elevator track with no one on them to control them or stop them in case of danger. No light was on the front end of the moving cars; no kick-in or push signal was given by the engineer by blowing the whistle nor was the bell rung as a warning to any person who might be on the elevator track or anyone who might be crossing the tracks. Each of these omissions was a flagrant breach of the rules devised by defendant itself for the protection of its train crews.

It is argued that the deceased was in charge of the train crew; that he planned out the switching operations, which were carried forward under his orders; that he told Hemphill he would watch out for the grain cars, and therefore it is not reasonable to suppose that he would expect a kick-in signal or that one of the trainmen would ride in the kicked-in cars, or place a lantern at the rear car

to indicate the cars were coming; that since the stock cars were to be returned to the north passing track after the grain cars were kicked-in, Toops knew that neither brakeman would ride the grain cars. The contention is not sound. In the first place, there is nothing in the record to indicate by reasonable inference or otherwise that the deceased expected the crew to do its work other than in accordance with the company's rules. Second, there is nothing upon which to base the assumption that the deceased had any reason to believe that one of the brakemen would not ride the kicked-in grain cars. Nor is there any evidence to show that Toops knew the stock cars were foul of the cross-over switch. It was too dark for him to see them or note their position. Had they been east of the cross-over switch the engine would have backed in and coupled with the grain cars. Testimony by Hemphill concerning the conversation follows:

"The last time I saw Mr. Toops before his death, he was standing at the east end of the platform station on the platform. I did not at that time have any talk with him. Before that I had talked with him. He was coupling up the air hose on these four or five cars that we picked up that were coupled on to the train; he was coupling the air hose up on them, and I walked down the south side of the passing track to this crossing to make that joint, and while Mr. McHenry was bringing the engine through the stock track I was standing at the crossing on the north side of the main line talking to Mr. Toops; he was on the south side of the main line, and he asked me if these fifteen cars were all in one cut and I told him they were, and that I would kick them all into the elevator track. He said, 'All right, I will look out for them.'"

The fact that Toops knew the cars were coming does not, in our opinion, relieve the defendant of liability for the negligent manner in which the cars were sent in on to the elevator track. He did not know that they would be kicked in without a signal from the engineer; he did not know that they would come silently down upon him without a white light on the leading car; he did not know that they would come down upon him without a brakeman in control thereof and in a position on the end of the car where he could see persons upon the track and protect them from the danger. It must be assumed that Toops was familiar with the rules and likewise had a right to believe that his brakemen and enginemen were familiar with them; he had a right to believe that the rules would be observed by each one of his trainmen; it was but natural for him to make the attempt to cross over the track because no warning of any

kind had been given that the cars were approaching. He had a right to rely upon the requirements of rule 473 (*supra*) which provided that in rounding all curves where the view is obscured, a whistle shall be sounded twice, notifying him that the cars had been kicked-in on the elevator track. Engineer Hall testified:

"It is usual for the engineer to give a signal when he is starting up a train on a kick signal."

The deceased was not familiar with the elevator track; he approached it in the dark from the north for the first time in thirteen years. He is presumed to have been exercising due care and it may therefore be assumed that when he arrived at the track and attempted to cross it he listened for signals and heard none; that he looked for approaching cars with a light and saw none and that he stepped upon the defective track for the purpose of crossing over and instantly became aware that the kicked-in cars were upon him, but on account of the defective condition of the track it was impossible for him to escape; that in making an effort to escape he was knocked down, and as he fell forward his hat, lantern and pencil were propelled to the south side of the track. On account of the curve in the track his lighted lantern (which was thrown or fell out of his hand while falling) could not be seen by the crew. The position of the body indicates that he was knocked down by the west end of the moving grain cars. His train book containing thirty-four or thirty-five bills dropped into the center of the track between the rails and was lying two or three feet east of his body.

*McMullen v. Railway Co.*, 107 Kan. 274, 191 Pac. 306, was in many respects similar to the instant case. McMullen was a brakeman for the Santa Fe, and was working at the yards at Emporia, helping make up a freight train. It was his duty, when the train was made up, to go to the rear end of the train and close the stop cock and couple up the air hose. The evidence showed that it was customary for trainmen in making up trains in yards to have recourse to the method of kicking-in cars. McMullen knew of these things. He was found dead. No one saw the accident. The jury found the train crew guilty of negligence. A verdict was rendered for plaintiff and affirmed by this court. It was a no-eyewitness case. Conductor Toops is presumed to have been exercising reasonable care. There is no evidence to the contrary. He is presumed to have been acting in the line of his duty which required him at some time or other to

be in the position where he was found. In the McMullen case (*supra*) it was said in the opinion (pp. 280, 281):

"Counsel for the defendant in their brief say:

" 'There was no eyewitness to the accident nor was there any testimony as to how it occurred. It may be assumed, however, that very shortly after the conductor and brakeman left the way car, he left the car and closed the angle cock and at that time the cars were kicked in on track 4, and by the impact, while he was between the rails on track 4, and at the rear end of the way car, was knocked down and run over. This assumption is based entirely on the situation appearing after the accident. . . . The duty of the conductor and brakeman of the train crew was to examine the seals and check the cars in the train, and that of McMullen was to close the angle cock, hang up the tail hose, and couple up the air hose in the train. This was usually done after the train was made up and just before or after the road engine was attached to the train. Although from what he told Doctor Eckdall, it was not the proper time to do so, he thought it had to be done and he would perform that duty while the train was being made up.'

"From all this testimony and the rules of the company referred to, and the condition of affairs assumed by counsel for defendant, it seems unreasonable to hold that McMullen was not engaged in the performance of his duty when injured, or that he was not located and engaged as the switch crew knew he or some other brakeman ought to be.

"While it may not have been the duty of the switch crew to keep a lookout under ordinary circumstances for a member of the train crew attending to the air couplings, the violent collision caused by the wrong signal and its effects were such as to make it a question for the jury whether such operation was negligent or not. (*Saar v. Railway Co.,* 97 Kan. 441, 155 Pac. 954.)

"But it is urged that the negligence on which the jury based the verdict was other than that alleged in the petition. We hold, however, the charge that the switch engine and cars were shoved at a dangerous rate of speed and run with great force and violence without warning against the other cars of the train, causing the way car suddenly and violently to move backwards over the body of McMullen, fairly includes the cause of such alleged violence, which was the transmission of the wrong signal. (*Linker v. Railroad Co.,* 82 Kan. 580, 109 Pac. 678.)

"It is also urged that the deceased assumed the risk, thereby exonerating the defendant. In *Spinden v. Railway Co.,* 95 Kan. 474, 148 Pac. 747, we held that in an action under the federal employer's liability act it was error to instruct that the assumption of risk could only be established by showing that its danger was so glaring that a person of ordinary prudence would not have attempted it. In the opinion it was said:

" 'The employee is not regarded as assuming unknown or unappreciated risks arising from his employer's neglect, unless they are so obvious that an ordinarily prudent person would observe and appreciate them.' (p. 476.)

"The federal supreme court in *Seaboard Air Line v. Horton,* 233 U. S. 492, held that congress in enacting this legislation based the action upon negligence only, and excluded responsibility of the carrier to its employees for defects not attributable to negligence. Touching risks not naturally incident to the occupation it was said:

" 'These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them.' (p. 504.)"

(See, also, *Reese v. Phila. & Reading Ry.*, 239 U. S. 463; *Ches. & Ohio Ry. v. De Atley*, 241 U. S. 310; *Ches. & Ohio Ry. v. Proffit*, 241 U. S. 462; *Chicago, R. I. & P. Ry. Co. v. Ward*, 252 U. S. 18.)

It is contended that the deceased "assumed the risk involved in the operation." We believe that the condition of the track and the manner in which the train crew kicked-in the fifteen cars were not risks which Toops assumed. There was no evidence that he knew it was a custom of this train crew or of any train crew to kick-in cars at stations in the manner in which these were kicked-in. There was some testimony that it was the custom to kick-in cars in making up trains, but we believe the inference can fairly be drawn that that had reference to the making up of trains in *yards* and not to switching operations at *way stations*. As before noted, the evidence was that Rolla was not a yard. The defendant's rules specify that when cars are pushed by an engine (except when shifting or making up trains in yards) a white light must be displayed on the leading car at night (rule 24) or a flagman must be on the front of the leading car by day. (Rule 102.)

In 39 C. J. 692 it is said:

"Risks which arise from the negligence of the master or those representing him are not 'ordinary risks' incident to the employment, but are 'extraordinary risks.' Hence, under the general rule as to extraordinary risks, but subject to the limitations hereinafter considered, risks which result from the negligence of the master, that is to say, those risks which are avoidable by reasonable care on his part, are not assumed by the servant. The master, in the proper performance of his duties as such, is bound to exercise care and prudence to prevent his employees from being subjected to unreasonable risks or dangers, and to agree by implication of law not to subject a servant employed by him to extraordinary or unusual perils, and the servant has the right to assume that the master will perform his duty in this respect, except to the extent that the rule may be modified as to risks that are so open and obvious that a man of ordinary prudence would see and appreciate them; and it is very generally declared that the risk assumed commences only after the master has exercised due care in the performance of the duties which the law casts upon him." (See, also, 18 R. C. L. 676, 677.)

The defendant cites and relies on *Salisbury v. Atchison, T. & S. F. Rly. Co.*, 125 Kan. 131, 263 Pac. 791. The facts in that case are entirely different from those in the instant case. The plaintiff there testified:

" 'I was struck in the back by the train. I don't know what part of the train struck me. . . . Something that stood out past the cars hit me. I do not know what it was. The train kept going on after it hit me. I didn't know what it was that hit me. I did not see the thing that struck me.' " (p. 133.)

In the Salisbury case the court quoted from *Douglas v. Mitchell's Ex'rs*, 35 Pa. 443, as follows:

" 'As proof of a fact the law permits inferences from other facts, but does not allow presumptions of fact from presumptions. A fact being established, other facts may be, and often are, ascertained by just inferences. Not so with a mere presumption of fact. No presumption can with safety be drawn from a presumption; there being no fixed or ascertained fact from which an inference of fact might be drawn, none is drawn.' " (p. 135.)

Here several physical facts established by the evidence clearly show how Conductor Toops met his death. It is proper, therefore, to draw inferences from those physical facts. The fact that the track was skeletonized and dangerous, especially in the nighttime unless great care was used by the person crossing over it to avoid falling; the fact that the lantern was lying in the weeds three or four feet south of the track and the conductor's lead pencil was between it and the south rail; the fact that his head, arm and hat were on the south side of the track; the fact that his train book with thirty-four or thirty-five bills in it was lying in the center of the track about three feet away from his body; the fact that his body had been dragged down the center of the track two or three feet until the shoulders were jammed against the derail, are all physical facts from which proper inferences may be drawn as to how the death occurred.

In the Salisbury case, *supra*, it was observed that—

"With the presumption that the injured employee used due care goes the correlative presumption that the employer used due care. This presumption must be overcome by evidence. When circumstantial evidence is relied on to prove a fact, the circumstances must be proved. The circumstances must not themselves be presumed, and one presumption cannot be built upon another." (p. 134.)

The presumption that the defendant employer in the instant case used due care was overcome by the evidence.

It is argued that there was no evidence to support the claim that the deceased was struck by the west end of the fifteen moving grain cars, but that he must have attempted to climb to the top of the train and somehow or other have fallen between the first and second moving cars. The argument is not reasonable. The physical facts from which a reasonable inference must follow indicate that the de-

ceased was struck by the west end of the cars. For instance, the position in which his lantern, hat and pencil were found. He was right-handed. Inasmuch as he had come south to cross the track it is natural to conclude that when he was struck his pencil and lantern were thrown out and away from the track. His train book, with the bills in it, was found in the center of the track between the rails and east of his body, indicating that he was carrying the train book in his left hand at the time he was struck, and dropped it in the center of the track. Had he attempted to climb on the train and fallen off, the train book would undoubtedly have been found in his pocket. His body was dragged between the rails for a distance of two or three feet. It is argued with much emphasis that the deceased could not have been struck by the first car because there was no blood on the wheels of that car. The contention does not appeal to us for several reasons. First, there was testimony by a physician showing that "in a crushing injury where a railroad car wheel or engine mashes off a member it mashes up the tissue so badly, including the blood vessels, that there is no bleeding immediately following, like there would be if it was cut off with a sharp instrument." Second, the position in which the body was lying, with shoulders on the derail, breast up, legs and feet extending north across the track and a little to the east, the head and right arm having been mashed off and the arm found west of the head; the scraping of the dirt and gravel in the roadway, showing that the body had been dragged, considered altogether, give evidence of the fact that the deceased was struck, knocked down and dragged or rolled by the first car, but that the wheels of the second car were the first to actually run over the body. On the other hand, if he had attempted to climb on the moving train and had fallen, he would naturally have fallen outside the rails. His body would not have been inside the rails and lying across the roadbed.

The defendant argues that it was not the custom and practice to have a brakeman at the rear end of the cars which the crew were moving in switching operations, but it says that "the protection of the public is a very different proposition, and with regard to the public the rule probably is that in switching at night there should be a brakeman or flagman on the rear car with a light; but in this case the cars were not approaching a public crossing nor any like place." The last statement disregards the fact that there was a public road

crossing over all of the tracks just west of the depot and running between the elevators where the grain cars were to be spotted.

A number of cases are cited by the defendant in support of the theory that the giving of signals by the ringing of a bell or blowing of a whistle would cause confusion and is therefore not required. The difficulty with defendant's contention in this regard is that this accident happened at a station and not within a "railroad yard." The defendant's argument is entirely correct so far as it applies to railroad yards. In the instant case the very signals, the lack of which is claimed as negligence, might, if given, have prevented the tragedy. The ringing of the engine bell or whistling from the engine could not have been confusing because there was no other engine moving at the station. A proper whistle would have apprised the deceased that the cars were "kicked" back.

The main contention of the defendant is that there was no *prima facie* case for a jury, a contention we cannot sustain. This is not one of those cases where we can say as a cold-blooded matter of law that there was no negligence and no liability. The physical facts, the evidence and the fair and reasonable inferences to be drawn therefrom were, in our opinion, sufficient to justify the conclusion reached.

The defendant contends that the verdict ($22,750) was excessive, a contention with which we might be inclined to agree but for the fact that the defendant appears to be in no position at this time to raise the question. No complaint of the amount of the verdict was made by the defendant in its motion for new trial nor in its specifications of error. Under the oft-repeated rule that alleged errors not presented to the trial court cannot be considered here, we are unable to go into this phase of the controversy.

Complaint of the instructions and that the plaintiff was not properly appointed administratrix by the probate court of Douglas county have been considered but cannot be sustained. Nor is it necessary to add discussion of those questions to an already lengthy opinion.

The judgment is affirmed.

MARSHALL and HUTCHISON, JJ., dissenting.

BURCH, J. (dissenting): The action was based on the federal employers' liability act. The case is governed by federal law. The

judgment must stand up, if at all, under the decisions and the method of review of the supreme court of the United States. The opinion of this court makes no reference to decisions of the federal supreme court touching any phase of the case except the subject of assumption of risk, which I do not regard as important. If I read the federal decisions correctly, the judgment of the district court should be reversed.

The jury found defendant was negligent in not protecting the rear end of the fifteen grain cars. The opinion of the court approves the finding because neither brakeman nor white light was on the west end of the grain cars, and conductor Toops had a right under the rules to believe and rely on the fact that one of his brakemen would ride the kicked-in grain cars, the brakeman taking a position on the west end of the first car, where his light could be distinctly seen. The rules supposedly creating this duty were rules 24 and 102.

Conductor Toops knew perfectly well that no brakeman with a light would be on the end grain car to show him the string of grain cars was coming, because he planned the work so his brakemen would of necessity be otherwise employed, and in planning the work he was the company.

The first work done was to get five loaded grain cars from the elevator track and put them into the train. Toops made the air coupling. The train was then made up, but there was switching to do. Toops and his two brakemen went over the switch list. The instructions were to get fifteen empty grain cars, which were behind twelve stock cars, off the passing track, and place the grain cars at the elevators for loading. The head brakeman went east with the engine to open and close switches and make the engine couplings. The rear brakeman stayed behind to make the coupling of cars back at the road crossing. This done, engine, stock cars and grain cars all went eastward, and both brakemen went with them. The grain cars were to be kicked in on the elevator track, the stock cars were to be replaced on the passing track, and the engine was then to be attached to the east end of the string of grain cars in order to push them to the elevators. The head brakeman's duties did not contemplate that he should leave the engine standing idle, get on the rear grain car, ride it back to show Toops the string of grain cars was coming, and then walk back, to throw the switches so the stock cars could be replaced, and after that the engine could be attached to the grain cars. The rear brakeman was obliged to take care of the stock cars after they were kicked back on the

passing track, and he could not get on the rear grain car and ride it back to show Toops the string of grain cars was coming, without holding up the work. Toops had but two brakemen. The train was to be put over the road that night, and it would have been the essence of nonsense for Toops to take either brakeman from his proper employment and assign to him the duty of riding the rear car of the string of grain cars, lantern in hand, back to where Toops was waiting for them, just to show Toops they were coming. That practical application of the rules required no such absurdity was disclosed by the following testimony for plaintiff:

"And while Mr. McHenry was bringing the engine through the stock track, I was standing at the crossing on the north side of the main line, talking to Mr. Toops; he was on the south side of the main line, and he asked me if these fifteen cars were all in one cut, and I told him they were, and that I would kick them into the elevator track. He said, 'All right, I will look out for them.'"

Toops knew perfectly well that neither of his brakemen carried two lanterns, one to work with and the other to be put on the rear end of the string of cars to show Toops they were coming. Of course there was no need of a light to protect the public crossing west of the station, because Toops was on guard looking out for the cars some 300 feet east of the station.

It was not Toops' duty merely to assist in the switching operations. Rule 396 required him to attend personally to the switching, since he had no unloaded way freight to check. He was in full charge of the switching operations, not theoretically, as a matter of rule, but as a matter of fact. One of plaintiff's witnesses testified:

"If he tells me to do something as a brakeman, it is my duty to do it; and if he tells Hemphill to do something, it is Hemphill's duty to do that; and if he tells the engineer to do something, it is the engineer's duty to do it. The conductor has entire charge of the switching operations, and the others simply work under him."

The result is, protection of the rear end of the fifteen grain cars goes out of the case as a basis of recovery, because the company was not negligent toward Toops in that regard.

The second ground of negligence found by the jury was failure of the engineer to give a signal when starting to back the cars. What was the purpose of such a signal? Manifestly, the purpose was to apprise a person who might not anticipate a backward movement of the train that such a movement was about to begin, and would result in sending cars in on the elevator track.

At the time the signal should have been given the end of the

string of grain cars was east of the junction of the elevator track with the main track, the stock cars were east of the grain cars, and the engine was at the east end of the string of stock cars. The curve and the embankment intervened between the end car of the string of grain cars and the place Toops chose to meet it. A sounded signal would be far away. Time would elapse before the end car would reach Toops and, signal or no signal, he would necessarily be obliged to be on the lookout for approach of the expected cars. So rule 483 applied to Toops. That rule required him to be vigilant and cautious, and not trust alone to signal or rule of safety. He had sent the engine and brakeman eastward for the express purpose of kicking the grain cars upon the elevator track. They were certain to arrive after sufficient time to complete the preliminary operations and then perform the kicking operation. There was in fact delay. The engineer gave the cars a kick, and stopped. The slack ran out, and it was discovered the grain cars were not detached. New signals were given, a second kick was made, and the grain cars were cut off. In anticipation of their approach, Toops went to a proper place to meet them. When the end car approached him it was moving slowly, because inertia very soon brought it to rest, and the presumption is Toops was vigilant and cautious, and watched carefully for approach of the very cars he went to the switch track to meet.

The jury found that Toops had a good lantern, but the jury found he could not see the cars with it (finding No. 7). The two brakemen had no difficulty in finding cars and switch stands and safely making couplings with their lanterns, one of which was like the one Toops carried. Toops said he would look out for the grain cars. As indicated, he knew there would be no brakeman with a lantern and no white light to show him the end car of the fifteen grain cars. Signal or no signal, he had to find the grain cars with his lantern. He knew and the jury knew he was equipped to do so, and the seventh finding of the jury would be ludicrous if the subject to which it relates were not so serious. The court's opinion properly indulges the presumption that when Toops arrived at the switch track he looked for the approaching grain cars, but the court's hypothesis that he did not see the end of the grain car which immediately struck him is quite as unsupported by evidence as the jury's finding.

Under federal law the employer must not only be negligent, but the proof must show that the negligence caused the injury. (*St. L. &*

*Iron Mtn. Ry. v. McWhirter,* 229 U. S. 265, 281; *C. M. & St. P. Ry. v. Coogan,* 271 U. S. 472, 478.)   In this instance there is no evidence that failure of the engineer to give a signal before he kicked the grain cars upon the elevator track had anything to do with the accident.

The third element of defendant's negligence found by the jury was the poor condition of the track.   A photograph of the track taken the day after the accident is in the record.   The question fairly arises whether the jury was competent to declare defendant negligent in providing the kind of track disclosed by the photograph and the testimony, and whether Toops did not assume the risk of using skeletonized elevator tracks at small stations on the Dodge City-Elkhart branch line; but waiving this matter, there was no evidence the condition of the track had anything to do with Toops' death.

Nolan said he was slow about making the cut for the first kick because of the condition of the track—bad footing.   The conclusion that Toops was killed because of bad track is on a par with the reasoning of a witness for plaintiff.   The witness opined the accident might have been caused, not by lack of ballast, nor by weeds, nor by skeletonized track, but because of a spike not fully driven down.   The witness testified:

"He could have caught his foot on a spike.   There is a spike sticking in there just close to where he laid on the inside of the rail. . . . I didn't see anything to indicate that he fell on a spike, but he was there, and the spike was there."

All the proof there is in the record that the condition of the track caused the accident is that the track was bad and the man was found dead upon it.   To conclude the condition of the track caused the accident involves a spurious use of the *res ipsa loquitur* doctrine instead of speculation, in determining cause, a method specifically condemned by the supreme court of the United States in an opinion published April 15, 1929.   (*Louisville & Nashville Railroad Co. v. Chatters,* 49 Sup. Ct. Rep. 329.)

The court's explanation of the accident is as speculative as it is schematic.   It is assumed without evidence that Toops did not reach the place of the accident until just as the rear grain car arrived.   Under this assumption Toops would have run into the side of the string of grain cars but for the failure of the first kick of the engine to send them in on the elevator track.   To the first assump-

tion is added another, having no basis in the evidence, namely, that Toops stepped on the track in front of the moving end car, which he looked for and could not see, on his watchful way to the south side of the elevator track. Then follow assumption after assumption, until the fanciful account of the accident is complete. The end of the first car struck Toops; his agility was handicapped by the skeletonized track, his feet were trapped, and he was knocked down; he threw his lantern and pencil to a place beside the track, with his right hand; he dropped his train book, which he held in his left hand, between the rails; then with his hands free, he was helpless, and suffered fatal mutilation. Attorneys for plaintiff go so far as to give us the workings of his mind while facing his doom. They say he threw his lantern to the side of the track for an emergency signal, which nobody could see, and the court does not relinquish the view that Toops actually threw his lantern into the weeds beside the track.

It will be recalled that Toops' hat was found beside the track with the lantern and pencil. Did he throw his hat there as he did the lantern and pencil? If so, with which hand? Or did the hat fall there, and if it did, why may not the lantern and pencil have fallen there?

The lantern was from three to four feet south of the south rail of the track. The hat was nearer the rail, and the pencil still nearer. Conceive of a yardstick poked under the overhang of a large-size grain car, with one end against the rail. The other end of it would be in the midst of the articles mentioned, and it is just as reasonable to assume that the articles fell at the side of the car as that they were thrown from a place on the track at the end of the car by a man suddenly knocked down.

The court says that if Toops had been on the car and had fallen down, his train book would have been in his pocket. One easy guess is that maybe the train book was in a pocket when the terrible encounter commenced which ended with the headless body jammed against the derail.

The court says that if Toops had attempted to climb on the moving cars and had fallen, he would naturally have fallen outside the rails. I am not familiar with the law of nature which would prevent him from falling partly outside the rails and partly between the rails.

At some time Toops left the station platform, where he was last seen, and went to the switch track, where he was killed. He was

in the midst of unfamiliar surroundings. The night was very dark, and after traveling about 100 yards, he was to approach the elevator track for the first time in thirteen years. Just why he should carry his pencil in his lantern hand, and his trainbook with thirty-four or thirty-five bills in it in his left hand, to meet a cut of kick-in cars which he was to take care of, has never been explained. Book and pencil in separate hands could not help him find the way, or find the cars on the switch track, or be of use to him when he reached the switch track, or be of use to him when he began to do what was necessary to take care of the cars. The articles might be a hindrance to him in doing his work, something which an experienced and prudent man would guard against. A common-sense view would be that when he was ready to go he stuck his pencil under his hat the way conductors do, put his billbook in his pocket, took his lantern in the hand he used by force of habit, and proceeded to the place where he had planned to be. Anyway, there would have been nothing fantastical about this kind of conduct, and if he did conduct himself in that manner, it requires no more invention to explain what followed than appears in the court's opinion.

To render the court's theory of the accident tenable, it is indispensable that Toops should have been struck by the west end of the west grain car, knocked down and then killed. The theory has been that he was killed practically as soon as he was knocked down. Some physical facts rationally considered refute the theory. Plaintiff's witnesses testified there was no blood on any of the four south wheels of the west car, and that there was blood on the south wheels of all other grain cars. In plaintiff's brief it is said that, "blood was found on all of the cars except the first car on the west end of the string of fifteen cars."

The jury's evasive answer to the third interrogatory discloses the candor which it displayed in disposing of the case. A witness who examined the car wheels both the night of the accident and the next morning testified there was flesh as well as blood on the wheels, and nobody corrected or contradicted him. His testimony is important, and follows:

"We examined the trucks of the freight cars that night, and then made another examination the next morning. We found no marks of blood on the first car. The first marks of blood we found on them were on the west end, west wheel, on the south side of the second car. Following these cars up to the engine, we found blood on every wheel, blood and flesh on every wheel up to the tender, up to and including the tender.

"I crawled under the cars the next day, just under the first two. I made this examination at the request of Mr. Shull, the claim agent of the Santa Fe, and Doc Ellis. It was made in the morning. Doctor Ellis was the doctor that was called before we moved the body, before anybody would touch it. The doctor requested that we look the ground over thoroughly, because we would all be called, and that we would more than likely be called on the coroner's jury."

To prevent the jury from drawing from the physical facts the natural and inevitable inference that Toops was killed by the first wheel of the second grain car, plaintiff produced a physician who gave the following testimony:

"In a crushing injury where a railroad car wheel or railroad engine mashes off a member, it mashes up the tissues so bad, including the blood vessels, that there isn't any bleeding immediately following it, like there would be if it was cut off with a sharp instrument."

When Toops was killed the grain cars were moving so slowly they stopped within a short distance. The head brakeman testified as follows:

"To the best of my judgment, the west end of those fifteen cars was about three or four car lengths west of the derail."

This testimony must be true, because the evidence was uncontradicted that the east car of the string of grain cars stopped within two or three car lengths of the elevator track switch, and the sketch, drawn to scale, submitted as illustrative of the station grounds, indicates the string would not be long enough to reach five car lengths beyond the derail.

It is a matter of common knowledge that the head is supplied with blood by large arteries ascending on each side of the neck, that the blood is returned by large veins, and that arteries and veins have branches and ramifications supplying the various tissues. Toops' head was severed, and his right arm was mangled and severed. To do this it was necessary that the car wheel pass through arterial and venous blood. The physician would make of a car wheel and a steel rail such deft instruments that crushed major arteries and veins in crushed tissues would be sealed up so that no blood could escape—immediately. The doctor's testimony did not cover the subject of crushed tissue adhering to the wheel that crushed it. We have then this operation: The first car wheel does its dexterous work. The car moves on five or six feet—whatever the distance between the wheels of the front truck. The second wheel of the front truck comes through clean because the blood cannot start to

flow. The car rolls slowly on some twenty-five feet—or whatever the distance between the trucks of a forty-foot grain car. The first wheel of the rear truck passes over the place of severance. Still no bleeding. The car moves on, and the last wheel of the car comes in contact with no blood. The car rolls on for the distance between the rear wheel of the front car and the front wheel of the second car. Then is the time for bleeding to commence and flesh to adhere, and they do so.

In cases of this character the supreme court of the United States examines the record, determines for itself what is substantial and what is unsubstantial testimony, and does not permit a jury question to be raised by unsubstantial testimony. (*Gulf, etc., R. R. v. Wells*, 275 U. S. 455.) I fear the supreme court of the United States would not regard the physician's testimony as making a substantial contribution to the solution of the case.

Since the theory that the first car killed Toops forces the facts, the court falls back on the second car. Toops comes down to the switch track, and fortuitously steps on the track just as the west end of the first car reaches the exact locality. The west end of the first car strikes him, and he makes distribution in space of lantern, pencil, hat and train book. He is knocked down, but all the first car does is to push him maybe two or three feet, possibly roll him some. The second car then comes along and kills him. Besides nullifying the court's approval of the doctor's testimony regarding postponed exudation of blood, this will be a great surprise to plaintiff's attorneys.

The petition alleged that Toops was struck by the kicked-in cars, was knocked to the ground between the rails at a point three or four feet [two or three feet] east of the derail, and his body dragged until his shoulders rested against the derail. The petition then stated:

"That his head and right arm had fallen in such manner that they lay across the south rail of the elevator track and were severed from his body by the wheels of the rear car of said kicked-in cars; . . ."

The brief for plaintiff contains the following, printed in italics: "The petition contains our theory of the case, and the evidence amply sustains our theory."

The brief does depart a little from the petition. The petition states that Toops was knocked down, that his body was dragged, but that his head and arm had "fallen" so they were severed. The brief says:

"His head fell over the south rail, as did his arm. We are not clear as to whether the front wheels severed his head and arm, or whether it was the rear wheels of the first car."

There was evidence the body was dragged westward a little way, and that the severed arm lay about three feet west of the severed head. There is not even a scintilla of evidence that the first car did the dragging. Finding the court's conjecture respecting a vital matter at odds with the conjecture upon which plaintiff commenced, tried and won the case, I am content to close with the observation that the decisions of the supreme court of the United States forbidding a jury to speculate on cause of accident are so numerous citation of them is superfluous.